# JOHN M. BURKE

Attorney at Law

26 Court Street – Suite 2103
Brooklyn, New York 11242
Phone (718) 875-3707
Fax: (718) 875-0053

November 8, 2024

Honorable LeShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

Re: <u>United States v. Quintin Green</u>
20 CR 331

Dear Judge DeArcy Hall;

  The defense writes on behalf of Quintin Green to request that the Court be as merciful as possible at the time of sentence. In view of Mr. Green's horrific childhood and chaotic adolescence, a lenient sentence would serve both the interest of justice and satisfy the Parsimony Clause's directive to impose a sentence no greater than necessary.

## I  THE CRIMES OF CONVICTION

  In accordance with an agreement with the government, Mr. Green has entered a plea of guilty to Counts Six and Nine of the Indictment. On July 7, 2020, at the age of nineteen, Mr. Green and another individual fired several bullets at Shatavia Walls in Brooklyn, New York. Ms. Walls died ten days later as a result of this shooting. On November 3, 2020, Mr. Green attempted to rob a Target department store in Staten Island, New York.

1

Mr. Green has admitted his guilt and accepts responsibility for these criminal acts. During his more than three years in custody, Quintin has thought about his crimes every day and is ashamed of his conduct. He apologizes to the family of Shantavia Walls and regrets that there is little he can do to lighten the burden of the suffering he has forced them to carry.

## II  THE ADVISORY GUIDELINES

The Department of Probation determined that Mr. Green's Total Adjusted Offense Level is 40 and with a Criminal History Category of II. The resulting Guideline range is 324 months to 405 months. (PSR ¶ 110) The defense has no objection to this calculation, but would like to point out that all of Mr. Green's criminal history points stem from a youthful offender adjudication incurred at the age of seventeen.

The plea agreement in this case, however, proposed a sentence of 420 months (35 years) pursuant to Federal Rule of Criminal Procedure 11(c) (1) (C).

## III  QUINTIN GREEN'S ABUSIVE UPBRINGING

Mr. Green was raised without a father and by a mother who was not equipped to care for him. He was shuffled between relatives as a young man and as he grew older, he was bounced from foster home to foster home. In between his stints in foster care, Quintin slept in city shelters and lived in the streets. Although Quintin is still in his early twenties, he has experienced a lifetime of abuse.

Quintin Green was born on August 15, 2000, in the Bronx, New York. At the time of his birth, Quintin's mother, Shaniqua Green, was 14 years old. Shaniqua did not understand what it meant to be a mother and

was not prepared to deal with the demands of an infant. Mr. Green's Aunt Paula Hauser reports the following:

> After observing Shaniqua with Quintin after his birth, the doctors told his great grandmother the only way he could come home is if she took custody of him. They said that a dog had more motherly instincts with her puppies than Shaniqua had with Quintin.

Quintin's birth to a middle school mother set the stage for a life of horrific abuse and neglect. In fact, it was a cycle of abuse that was repeating within the family. Joyce Green, Quintin's great grandmother, had adopted Shaniqua when she was five years old. In 2000, Joyce stepped in again to take care of Shaniqua's infant son Quintin.

When Quintin was six months old his aunt, Paula Hauser, moved from her home in North Carolina to the Bronx to help Joyce take care of Quintin. The family then moved from the Bronx to North Carolina when Quintin was still an infant. Once ensconced in North Carolina, Quintin's mother gave birth to three more children in rapid succession. Two of Quintin's sisters Iyonna Green, age 17, and Arianna Green, age 19, were adopted by another family and lost all contact with their brother. Zion Green, age 15, currently lives with her mother in the Bronx. Shaniqua was able to keep custody of Zion due to the efforts of Kinship Care, a non-profit organization capable of providing full time care for children.

When living in North Carolina, Shaniqua proved incapable of watching Quintin, refused to find employment, and relied upon public assistance and her Aunt Paula to financially support the children. Unable to function as an adult or a mother, Shaniqua lived with the children in an apartment run by the Durham Housing Authority. Despite Paula and Joyce's help, Shaniqua could not take care of her apartment or nurture the children. Quintin was frequently found wandering the streets and had to be returned to his apartment by the police.

Shaniqua should not be viewed as the villain or the "scape goat" of Quintin's life story. She was also victimized and brutalized during her formative years. She was born in the Bronx and her mother Veronica died from AIDS in her early 40's. Shaniqua's earliest childhood memory is being left in a crack house when she was four years old. Shaniqua was raped and sodomized by a family friend as a young child. The Administration of Child Services (ACS) place Shaniqua in the care of her grandmother Joyce Green when she was five years old. She was impregnated at the age of 13, and by the time Shaniqua was 18 she was out of school, jobless, and the mother of two children. Poverty, abuse and neglect left their mark on both Quintin and his mother.

Eventually Shaniqua left North Carolina for New York and gave her Aunt Paula custody of Quintin. She would occasionally visit Quintin and after a year in New York, Shaniqua asked Paula to also take care of the girls as well. It seemed that Social Services was trying to take custody of the girls because Arianna was forced to preform sexual acts with one of Shaniqua's friends. Although Paula assumed custody of the children, Shaniqua continued to receive welfare benefits for them in New York.

Quintin's time in North Carolina was not easy.  Paula was overwhelmed with raising all of these children. When Quintin misbehaved Paula would beat him with pots, pans, and electrical extension cords whenever he got into trouble. When Quintin was disciplined in school for fighting, he was made to kneel on uncooked rice as punishment. He was also punched and taunted by his aunt's boyfriend.

By the time he was in sixth grade, Quintin's Aunt Paula no longer wanted to care for him and he moved in with his great grandmother Joyce. During this period, Quintin received strict religious instruction at the Greater Joy Baptist Church. He was baptized three separate times and Quintin can still recite portions of the Bible by memory. Quintin warmly recalls his last few years in North Carolina as being the best part of his life. He played football, boxed, and attended church. Unfortunately, when

Quintin was 12 years old his mother completed a parenting class, regained custody of her children and moved them back to New York.

Once the children arrived in New York, the situation was dramatically worse. Quintin and his sisters ended up staying in a domestic violence shelter because Shaniqua was recovering from an abusive relationship. Douglas Fagan, the father to one of the siblings, had been beating Shaniqua for almost a year and tried to cut her throat with a machete. After a few months in the domestic violence shelter the family transitioned to a homeless shelter in Brooklyn.

Quintin moved from one homeless shelter to another until they finally settled in a *Win* Shelter on Glenwood Road in Brooklyn. This time proved to be a particularly difficult period for Quintin. He had a pronounced Southern drawl and was frequently "jumped" for being a "country boy". Quintin missed 90 days of classes when he was at the *Win* Shelter, and began to fall behind in school. Shaniqua began to smoke marijuana with Quintin because she knew he would start anyway and she thought it would be safer if he was using with her. While living in the shelter, Quintin began having sex with his mother's adult friends.

Because Quintin and the girls were frequently hungry, Quintin started to steal food from bodegas and super markets. He also stole clothes for the girls and himself. This behavior eventually came to the attention of ACS. The investigation by ACS confirmed the allegations of sexual abuse and inadequate guardianship and Shaniqua lost custody of her children. Quintin and his sisters were placed in foster homes.

Quintin last lived with his siblings when he was 14. The girls were eventually adopted, but Quintin was sent to live with his cousin Lorraine. This transition was a disaster for Quintin. He became enmeshed in violence and entrenched in the "gang lifestyle." Lorraine's sons were members of the Crips while Quintin had connections to the Bloods street gang. The sons tried to force Quintin to become a Crip and refused to back him up when other gang members attacked him. Lorraine watched as other

teenagers from the neighborhood assaulted Quintin with knives and machetes. After this incident Quintin was once again placed in foster care.

Without a family of any sort, Quintin looked to the gang to provide him with a sense of a family and male role models. He saw how "successful" gang members had money, trendy clothes and women. Quintin wanted the prestige of being "hood famous" known in the neighborhood for his daring acts of aggression and violence. He was unemployed and unable to support himself and this void was filled by the gang. Quintin did small favors for them and they in turn provided him with clothes, pocket money, and a place to sleep. In 2014, he was arrested and funneled through several juvenile jails. Between 2017 and 2020 he spent time in five different jails.

During his relatively short life, Quintin has been traumatized by numerous violent acts. He witnessed multiple stabbings and attacks while being held in juvenile and correctional facilities. Quintin himself has been attacked, beaten, and robbed. His close friend was murdered in 2020, and Quintin was shot in the leg when he was 13. All this fighting, stabbing, and shooting has left an indelible imprint on Quintin psyche.

The chaos and violence of Quintin's early years have taken a severe toll on his mental and emotional health. When he was in elementary school, he was diagnosed with attention deficit hyperactivity disorder (ADHD). He was prescribed several medications, Ritalin, Valvin, Concerta, and Focalin, but nothing was able to quell his impulsivity or inability to focus. Once he reached his teenage years, Quintin was found to be suffering from post-traumatic stress disorder (PTSD) and anxiety. He was prescribed the sedative Atarax to control his cold sweats and panic attacks. His fragile emotional health made it difficult to concentrate in school and despite having an Individual Educational Program (IEP), Quintin was unable to finish the eleventh grade.

Quintin's history of abuse inevitably led to self-medication. He started smoking marijuana when he was eight. By the time of his arrest

on this case he was consuming a quarter of a pound of "weed" on a daily basis. He also used alcohol as a tool to calm his inner turmoil. Quintin began drinking alcohol at age 10 and mostly drank at parties and social events. Over time his intake increased and by the time he was 15 he was drinking on a daily basis from morning till night. Quintin remembers that tequila was his drink of choice.

## IV  ALL OF QUINTIN GREEN'S CRIMES OCCURRED BEFORE HE WAS A MATURE ADULT

The crimes at issue in this case, occurred when Quintin was 19 years old. The crime used to compute his Criminal History occurred when he was 17. The Supreme Court has repeatedly stated that a defendant's youth is a mitigating factor when determining sentence. *See*, Graham v. Florida, 130 S. Ct. 2011, 2027 (2010) (the age of the offender and the nature of the crime each bear on the analysis); Roper v. Simmons, 543 U.S. 551, 570 (2005) (the obvious differences between youths and adults render suspect any conclusion that a juvenile falls among the worst offenders); Johnson v. Texas, 509 U.S. 350. (1993) (youth is a time and condition of life when a person may be most susceptible to influence and to psychological damage). In Johnson, the Supreme Court stated:

> The susceptibly of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime

7

> committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, [t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. Id. (citations omitted).

This analysis is not altered by the fact that Mr. Green was nineteen at the time of the offense. As stated by the Supreme Court in Roper, "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper, 543. U.S. at 574. Psychology and brain imaging strongly support the view that 19 year old males are still developing the brain functions that control impulsiveness and resistance to peer pressure, and that a nineteen year old is still an "adolescent" in terms of brain and psychosocial development. See, for example, Brief for the American Psychological Association and Missouri Psychological Association as Amici Curiae Supporting Respondent at 9, Roper v. Simmons, 543. U.S. 551. (2005) (No. 03-633), 2004. WL 1636447. At *9 ("Roper, APA Brief"); Elizabeth. S. Scott. & Laurence Steinberg, *Rethinking Juvenile Justice* 236. (2008).

Numerous studies document the limitations on the ability of adolescents to control impulsiveness. See, Dr, Laurence Steinberg, *Adolescent Development and Juvenile Justice*, 2009 Ann. Rev. Clinical Psychol. 47, 58. (2009) ("[I]ndividuals become more resistant to peer influence and oriented to the future, and less drawn to immediate rewards and impulsive, as they mature from adolescence to adulthood."); Laurence Steinberg, et. al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self- Report*; Evidence for a Dual Systems Model, 44 Developmental Psych. 1764. (2008). (self-report and performance measures on tests show "a linear decline in impulsivity

8

between the ages of 10 and 30"). Brain imagery technology demonstrates that critical regions of the brain responsible for controlling thoughts, emotions, impulsivity, and actions continue to develop through age 25. See, for example, Elizabeth R. Sowell et. al., *Mapping Cortical Development During Childhood Through Early Adulthood,* 101. Proc. Of the Nat'l Acad. Of Sci. 8174. (2003) The Essential Guide for Ages 10-25, 116 (Rev. 2011) ("Imaging studies show that the brain is still maturing well into the mid-20s, especially in regions responsible for regulating emotions, controlling impulses and balancing risk and reward.").

Quintin Green fell under the spell of the gang lifestyle during middle school and his teen years. Given his horrific homelife, he had no real alternative. However, that being said, given the right setting, and with maturity, Quintin is capable of rehabilitation and leading a law abiding life.

## V    QUINTIN GREEN'S CONFINEMENT DURING THE COVID CRISIS AT THE METROPOLITAN DETENTION CENTER HAS BEEN UNDULY HARSH PUNISHMENT

Mr. Green was arrested in August 2021. To date, he has spent more than three years in custody. All of this time coincided with the Covid-19 crisis and its aftermath. When the pandemic hit this country, the MDC responded by initiating excessive lockdowns. Lockdown conditions mean that inmates are confined to their cells for 22 to 23 hours a day, meals are served cold, if at all, and there is little or no contact with the outside world. These conditions are routinely reinstituted and continue for lengthy periods.

During the pandemic state and federal jails were rife with disease and both guards and inmates were infected and sickened. Stress and

anxiety levels were heightened because of fear of infection, the poor conditions, lack of family contact and the uncertainty that comes with "Pre-Trial" status. Quintin's incarceration under unduly harsh circumstances should be considered at sentence.

Incarceration during the pandemic was undeniably much more punitive. As the Honorable Paul Engelmayer observed "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is unavoidably, experienced as more punishing." United States v. Lizardi, 11 Cr 1032-55 (PAE) Dkt. No. 3523 at 7-8 (collecting cases) (releasing defendant with no underlying health issues, concluding that the combination of COVID jail conditions, the short period left on his sentence and other §3553(a) factors constituted extraordinary and compelling circumstances).

Life is never intended to be easy while in prison. However, Quintin Green's incarceration experience has been far bleaker and harsher than "normal". In United States v. Cirino, 19 CR. 323 (JRR) The Honorable Jed Rakoff varied downward from a 57 to 71 months Guideline Range to a 10-month sentence of incarceration, recognizing that, "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons"

As this Court is aware, the problems at the MDC did not fade away with the retreat of the Covid-19 crisis. In addition to the extended periods of lockdown, inmates at the MDC experience inadequate medical care and unchecked violence among numerous other issues. These issues have been most recently addressed in this District in United States v. Colucci, 23 Cr. 417 (GRB). Accordingly, we respectfully ask that the Court take

into consideration of the brutal and harsh conditions that Quintin Green has endured while in Pre-Trial custody.

## CONCLUSION

Mr. Green realizes that he has committed the serious and terrible crime of murder. He accepts responsibility for his crime and regrets it every day. He knows he must be severely punished for his crimes and he beseeches the court for mercy.

November 8, 2024                           Respectfully submitted,

/s/ John Burke
John Burke
Attorney for Quintin Green